**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

          **vs.**                              **7:23-CR-161**
                                                **(MAD)**

**DIONISIO FIGUEROA,** *also known as*
*Dionicio,*

                                  **Defendant.**

_____

**APPEARANCES:**                               **OF COUNSEL:**

**OFFICE OF THE UNITED**           **ANDREW ROHRBACH, AUSA**
**STATES ATTORNEY**                **FRANK J. BALSAMELLO, AUSA**
1 St. Andrew's Plaza                **JARROD L. SCHAEFFER, AUSA**
New York, New York 10007        **STEPHANIE SIMON, AUSA**
Attorneys for the Government

**OFFICE OF THE FEDERAL**       **PAUL J. EVANGELISTA, AFPD**
**PUBLIC DEFENDER – NDNY**    **JEREMY B. SPORN, AFPD**
54 State Street
Ste 310
Albany, New York 12207
Attorneys for Defendant Figueroa

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Defendant Dionisio Figueroa ("Defendant") is charged in four counts of a seven count indictment, charging him with conspiracy to bribe a public office, federal employee bribery, receiving unauthorized compensation as a federal employee, and making false statements to law enforcement agents. Trial is scheduled to commence December 4, 2023. Currently before the Court are the parties' motions *in limine*.

### II. BACKGROUND

Defendant and alleged co-conspirator Telesforo Del Valle, Jr.[1] are charged in a seven count indictment charging them with (1) conspiring to engage in a scheme during which Defendant referred criminal defendants to Del Valle in exchange for Del Valle paying Defendant a share of the fees Del Valle earned from such clients, in violation of 18 U.S.C. § 371; (2) federal employee bribery, in violation of 18 U.S.C. § 201(b); (3) payment to, and receipt by, a federal employee of unauthorized compensation, in violation of 18 U.S.C. § 203(a); and (4) making material false statements to law enforcement, in violation of 18 U.S.C. § 1001.  *See* Dkt. No. 3.

At trial, the Government expects the evidence will show that, since in or about 2002 through at least November 2022, Defendant was employed as a deputy clerk in the Magistrate Clerk's Office of the United States District Court for the Southern District of New York, which is located at 500 Pearl Street in Manhattan.  In that role, he was responsible for, among other things, entering data about official case events and filings on criminal case dockets; performing inquiries and giving information, whether in person, by phone, or in writing, regarding the status of cases; and assisting with the intake of criminal cases, including by preparing appearance bonds for defendants being released on bail, advising defendants and their family members about the conditions of such bonds, and ensuring that such bonds were properly executed before a defendant's release.  According to the Government, the evidence at trial will prove that Defendant did not faithfully execute his official duties as a court employee; instead, he agreed to accept bribes and compensation from Del Valle – a criminal defense attorney in the Southern District of New York for over twenty years – in return for referring criminal defendants in pending cases to Del Valle as potential clients.

---

[1] On November 16, 2023, Del Valle pled guilty to the crimes alleged in the indictment.

The Government contends that records from Del Valle's law firm, including ledgers and client files, as well as emails, text messages, voicemails, and other communications between and among Defendant, Del Valle, Del Valle's employees, and CC-1,[2] among other things, show that from 2011 through 2022, Defendant referred dozens of clients to Del Valle.  The Government expects that witness testimony from former clients and their relatives will further establish that Defendant spoke negatively about court-appointed counsel, touted Del Valle's prowess as an attorney, and encouraged potential clients and/or their families to retain Del Valle in criminal cases.  Other records, communications, and location data, as well as witness testimony, will prove, according to the Government, that Del Valle paid Defendant a percentage of his client fees through cash-stuffed envelopes that were typically retrieved from Del Valle's law firm by CC-1.

The Government further contends that evidence at trial will show that Defendant, Del Valle, and CC-1 all lied to law enforcement to conceal their criminal scheme.  In particular, on November 3, 2022, special agents from the U.S. Attorney's Office for the Southern District of New York executed search warrants for cellphones used by Defendant, Del Valle, CC-1, and one of Del Valle's employees.  While executing those warrants, the agents conducted interviews of Defendant, Del Valle, and CC-1.  Despite being warned that lying to federal agents is a crime, when asked about the scheme, all three made materially false statements that are readily disproven by, among other things, the evidence described above.

In its motion *in limine*, the Government moves regarding the following matters: (1) evidence of Defendant's significant debts should be admitted as evidence of his motive to engage in the charged scheme and to commit the charged offenses; (2) evidence of (i) Defendant's explicit threats against a person he suspected to be a witness regarding the charged offenses and

---

[2] "CC-1" is an unindicted co-conspirator, identified as CC-1 in the indictment.

(ii) false exculpatory claims by Defendant and his close associate, CC-1, about interactions among them, Del Valle, and Del Valle's office staff, are admissible as non-hearsay and to prove consciousness of guilt; (3) evidence and arguments suggesting that Defendant's conduct should be redressed through non-criminal enforcement should be precluded; and (4) evidence and arguments about potential punishment, prior good acts (or lack of other bad acts), uncharged individuals, and other irrelevant matters should be precluded.  *See* Dkt. No. 65 at 3.  In his motion *in limine*, Defendant seeks an order precluding evidence of the threats he allegedly made when interviewed by federal agents and precluding reference to the alleged debt as evidence of motive or intent.  *See* Dkt. No. 59 at 1-13.

### III. DISCUSSION

**A.**     **Motions *in Limine***

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence.  *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996); *Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co.*, 937 F. Supp. 276, 283 (S.D.N.Y. 1996).  "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds."  *United States v. Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001).  "[C]ourts considering a motion *in limine* may reserve decision until trial, so that the motion is placed in the appropriate factual context."  *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011) (citing *Nat'l Union Fire Ins. Co.*, 937 F. Supp. at 287).  Further, a district court's ruling on a motion *in limine* is preliminary and "subject to change when the case unfolds."  *Luce*, 469 U.S. at 41.  The moving party bears the burden of establishing that evidence is inadmissible

for any purpose and so properly excluded on a motion *in limine*.  *See United States v. Pugh*, 162 F. Supp. 3d 97, 101 (E.D.N.Y. 2016).

**B.**     **Applicable Law**

   ***1. Admissibility of Relevant Evidence***

   "[R]elevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  In general, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." Fed. R. Evid. 402.  A court may, however, "exclude relevant evidence if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

   ***2. Evidence of Other Acts Admissible as Direct or Intrinsic Proof***

   Direct evidence of a crime is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997).  As the Second Circuit has explained, "[t]he trial court may admit evidence that does not directly establish an element of the offense charged[ ] in order to provide background for the events alleged in the indictment." *Id.*; *see also United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).  This evidence "may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Gonzalez*, 110 F.3d at 942.  The Second Circuit has held that such evidence is admissible as direct evidence of a charged offense, and "is not considered other crimes evidence under Fed. R. Evid. 404(b),"

where such acts "arose out of the same transaction or series of transactions as the charged offense, ... is inextricably intertwined with the evidence regarding the charged offense, or ... is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *See also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *United States v. Baez*, 349 F.3d 90, 93-94 (2d Cir. 2003).

Like other kinds of evidence, other act evidence is subject to evaluation under Rule 403, which asks whether the probative value of such evidence is "substantially outweighed" by a danger of "unfair prejudice" or confusion. Fed. R. Evid. 403. The Second Circuit has found admission appropriate where the other act evidence "'did not involve conduct any more sensational or disturbing than the crimes with which [the defendants were] charged.'" *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)); *see also United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) (quoting *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999)). The mere fact that a jury may draw inferences from other act evidence that are unhelpful to a defendant does not render it inadmissible. Indeed, "any proof highly probative of guilt is prejudicial to the interests of that defendant." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995). "The prejudice that Rule 403 is concerned with involves 'some adverse effect ... beyond tending to prove the fact or issue that justified its admission into evidence.'" *Id.* (quotation omitted). Nor does a risk of prejudice from otherwise probative evidence mean such evidence must be excluded; rather, that risk can be addressed with a limiting instruction reminding the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987); *see also United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (explaining that "evidence

of compensation, wealth, or lack thereof ... may be admitted where other safeguards are employed such as limiting instructions").

### 3. Evidence of Other Acts Admissible Under Rule 404(b)

Rule 404(b) provides as follows:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b).

The Second Circuit has adopted an inclusionary approach to Rule 404(b), admitting other acts evidence unless it is "introduced for the sole purpose of showing the defendant's bad character, ... [is] overly prejudicial under Fed. R. Evid. 403[,] or not relevant under Fed. R. Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996). "The district court has broad discretion to admit evidence pursuant to Rule 404(b), and its ruling will not be overturned on appeal absent [an] abuse of discretion." *United States v. Midyett*, 603 F. Supp. 2d 450, 454 (E.D.N.Y. 2009) (citing *Carboni*, 204 F.3d at 44). The Supreme Court has recognized that other acts evidence "may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

In ruling on the admissibility of evidence under Rule 404(b), the court must consider whether "(1) it was offered for a proper purpose; (2) it was relevant to a disputed trial issue; (3) its probative value is substantially outweighed by its possible prejudice; and (4) the trial court administered an appropriate limiting instruction." *United States v. Edwards*, 342 F.3d 168, 176

(2d Cir. 2003) (citing *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992)).  The Government must show that it seeks to offer the other acts evidence for a proper purpose, not as improper propensity evidence.

**C.      Evidence of Defendant's Debts**

According to the Government, at trial it seeks to introduce evidence proving that, in addition to his employment in the Clerk's Office, for a number of years Defendant owned and operated a business in Manhattan under the name "El Mercadito del Cibao." Dkt. No. 65 at 10-11. State court records reflect that, on or about March 24, 2017, Defendant borrowed $55,000 from an entity called G-Max Management, Inc., pursuant to a promissory note that imposed certain stringent terms.  *See id.* at 11.  As relevant here, the promissory note provided for the accrual of interest at a rate of 13.5%, monthly interest payments, and repayment of the principal and any accrued interest on or before April 1, 2019.  *See id.*  The Government claims that Defendant did not abide by the terms of the loan and, on or about August 19, 2022, a civil lawsuit was filed against Defendant in Bronx County Supreme Court alleging, in sum and substance, that he had failed to make the payments required by the promissory note.  *See id.*  On September 27, 2023, the state court entered a default judgment against Defendant in the amount of $62,524.79, representing the amount owed to the lender on the note, interest, and certain costs associated with the lawsuit.  *See id.*  The Government argues that this evidence is admissible as direct evidence of motive for Defendant to engage in the charged conduct.  *See id.* at 11-12.  Similarly, the Government argues that this evidence is admissible under Rule 404(b).  *See id.* at 13.  In his motion, Defendant contends that this evidence is only marginally probative of motive and that it should be precluded because of the substantial likelihood of unfair prejudice.  *See* Dkt. No. 59 at 10-12.  Additionally, Defendant contends that his debt is "the definition of irrelevant." *Id.* at 10.

8

Defendant notes that the alleged scheme in this case began no later than 2011 and ran through 2022, while the debt in question was not incurred until 2017 and the lawsuit that resulted in the default judgment was filed in August 2022. *See id.* at 10-11.  Given that the debt was not incurred until six years into the alleged conspiracy, Defendant contends that this evidence has little relevance and is unduly prejudicial. *See id.*

As an initial matter, a debt incurred in 2017 is probative of Defendant's financial situation prior to incurring the debt, as the decision to take out a loan reflects Defendant's preexisting need for funds.  Defendant's willingness to assume a five-figure debt – due to be repaid in two years at a double-digit interest rate, and on his court salary – also provides a basis for an inference that Defendant had another income stream that he believed might have allowed him to repay the loan.  However, as Defendant notes, the conspiracy in this matter is alleged to have begun in 2011 – six years before Defendant assumed the debt at issue.  This timing makes the debt considerably less relevant to establishing Defendant's motive and intent to join the conspiracy.  While it is true that there is no requirement that, in order to be relevant, evidence must bear on Defendant's state of mind at every stage of the alleged conspiracy, the Court is concerned that danger of unfair prejudice and potential confusion outweigh the probative value of this evidence.  For example, should evidence at trial establish that Defendant was more actively engaged in the alleged criminal conspiracy after incurring this debt, this evidence would be substantially more probative of motive and intent.  Conversely, if the evidence at trial establishes that Defendant was more actively engaged in the alleged conspiracy before incurring the debt, the evidence would be of little probative value. *See United States v. Lane*, 323 F.3d 568, 581 (7th Cir. 2003) ("The existence of the outstanding and past due loans to a variety of organizations, banks, and one individual, demonstrated [the defendant's] complete financial situation as well as provided to the

jury a timeline as to [his] increasing debts and lack of financial liquidity to meet those obligations"). As such, the Court will reserve judgment on this aspect of the parties' motions *in limine*.

**D.      Defendant's Threats and CC-1's False Statements**

   *1. Threats*

As noted above, law enforcement agents from the U.S. Attorney's Office for the Southern District of New York conducted interviews of Defendant, Del Valle, and CC-1 (with whom Defendant resides). As relevant here, the special agents conducted audio-recorded interviews of Defendant and CC-1, which lasted for approximately thirteen and twenty-four minutes, respectively.[3]  According to the Government, after the interview of Defendant concluded and the recording device was turned off, "he made a number of spontaneous utterances in the presence of agents, including explicit threats of violence against an individual whom [Defendant] believed to be a witness against him ('Individual-1')." Dkt. No. 65 at 14. The Government claims that Defendant said, in substance and in part, the following:

> – "I have money saved for my 17-year-old grandson's college.  I am going to use that money to buy a gun so I can kill him."
>
> – (In Spanish) "I am going to get a machete and chop him into pieces."
>
> – "I am going to kill him."

*Id.*  The Government anticipates that one or more witnesses at trial will testify regarding Individual-1 and his connection to the facts of this case, including that Individual-1 was

---

[3] The Government notes that it previously produced these recordings to Defendant in discovery.  *See* Dkt. No. 65 at 14 n.5.  The interview of CC-1 was assisted by an investigative analyst who translated between Spanish and English, and the Government has provided draft transcripts of the interviews, with draft translations for CC-1, to Defendant's counsel in connection with its motion *in limine*.

intimately familiar with the referral-for-pay scheme and brought this information to the court's attention.  *See id.*

In response, Defendant does not "have a quarrel with the general proposition that evidence of threats made by the defendant can sometimes evince consciousness of guilt." Dkt. No. 59 at 3. Here, however, Defendant claims that these "threats" were merely "hyperbolic ramblings" that are "not the same as a sober expression of genuine intent." *Id.* at 4.  Defendant claims that the introduction of such hyperbolic threats would be substantially prejudicial.  *See id.*  Additionally, Defendant contends that the Government does not need this evidence to prove its case.  *See id.* at 9.

As the Government notes, it is not seeking to introduce these statements as reflections of sincere future intent and it agrees with Defendant that he made these statements while "emotional" and under "unusual circumstance[s]" and that they were likely "hyperbolic."  The threatening statements are, however, highly probative of Defendant's statement of mind – most notably his detailed knowledge of Individual-1's allegations about Defendant's involvement in the scheme and his clear recognition that Individual-1's allegations were profoundly detrimental to his life and livelihood.  Whether characterized as "an emotional, histrionic reaction," "highly agitated" in tone, or "hyperbolic ramblings," the fact remains that the agents' mere suggestion that Defendant engaged in the charged conduct elicited from him an outburst that rose to the level of threats of violence.  Individual-1's accusations no doubt made Defendant "hot under the collar," as captured in his vehement denials in the recorded interview.  However, as the Government notes, the accusations had a greater impact than that: they prompted Defendant to threaten serious violence, not because Defendant actually intended to shoot or chop up Individual-1, but rather

because Defendant was troubled by the consequences that he knew would follow from the accusations.

As the Government notes, it has no intention of arguing that Defendant is "a violent man." Indeed, if Defendant was a violent man who regularly made death threats, the statements at issue would be less probative; rather, it is precisely because the threats are so extreme – and so out of character for a federal court employee – that they are probative of his consciousness of guilt. Moreover, the cases that Defendant cites in discussing the potential for unfair prejudice are readily distinguishable.  For example, in *United States v. Cummins*, 858 F.3d 763 (2d Cir. 2017), the defendant was charged with murder, brandishing and discharging a firearm, and other violent crimes, and the government argued that the defendant's death threats were "devastating proof" that he committed real acts of violence.  *See id.* at 771.  Given the nature of the crimes that the defendant was charged with, the Second Circuit held that the evidence should have been excluded as unduly prejudicial due to the risk that the jury would construe the threat as evidence of the defendant's murderous propensity.  *See id.* at 775-77.

In the present matter, there is little concern that the jury will believe that Defendant is a violent individual given the nature of the charges against him.  Moreover, any prejudice to Defendant will be minimized by a limiting instruction to the jury about the limited permissible purposes of this evidence.  *See Cummings*, 858 F.3d at 775-76.

In its response, the Government suggests that should the Court find the specific words used by Defendant to be unduly prejudicial "because, for example, a reference to chopping someone with a machete is too 'grisly,' ... the agent testifying about the statements could offer more sanitized testimony that captures the general point here: that the defendant had such a strong and negative emotional reaction when confronted by agents that he threatened to physically harm

a person he knew to have blown the whistle on the referral fee scheme." The Court agrees with this suggestion. Offering this evidence in more general terms will reduce the risk of undue prejudice to Defendant while still permitting the Government to introduce this highly probative evidence.

Accordingly, the Court finds that, subject to the restrictions set forth above, the Government will be permitted to introduce testimony concerning Defendant's alleged threats.

### 2. CC-1's False Statements

The Government also claims that CC-1 made numerous false statements during her interview, including but not limited to, the following:

> – CC-1 initially denied any reason to meet an attorney named Del Valle, later qualified that Del Valle had come to a funeral for Defendant's father, but otherwise insisted that CC-1 did not know anything about Del Valle and had only seen Del Valle four years prior at the funeral.

> – CC-1 initially denied ever going to Del Valle's office, claimed not to know where it was, and later denied that Defendant ever asked her to run errands, including to Del Valle's office. She then claimed that she had been to Del Valle's office only once to bring Del Valle something relating to a friend of CC-1's, characterizing the interaction as taking a friend to Del Valle's office.

> – CC-1 denied knowing any of Del Valle's employees.

> – CC-1 claimed that Del Valle's office phone number was in her phone only because she had been there once when taking her friend. She further claimed that she had called Del Valle's office only once.

> – When pressed about her interactions with Del Valle's office, CC-1 volunteered, in substance and in part, "I don't need to go look for money or anything at Del Valle's. Look for money for what?" Prior to that denial, the agent conducting the interview had not mentioned picking up money from Del Valle's office – the agent had merely noted that the investigation concerned Defendant referring potential clients to Del Valle.

13

Dkt. No. 65 at 14-15.  The Government anticipates the evidence at trial will demonstrate that all of these statements were false, and that CC-1 had gone to Del Valle's office on multiple occasions to pick up cash-stuffed envelopes from Del Valle for Defendant.  *See id.* at 15.

In response, Defendant contends that these statements should be excluded because the Government has not proffered a basis for their admission.  *See* Dkt. No. 66 at 4.  "Saying that her general denials are not offered for the truth of the matter asserted but to show her consciousness of guilt, is a clever dodge." *Id.*  Additionally, Defendant claims that CC-1's consciousness of her own guilt is not relevant.  *See id.*  Moreover, Defendant argues that CC-1's statement about not looking for money at Del Valle's office is "far more equivocal and ambiguous than the Government admits," since the statements came toward the end of the interview and not at the beginning or before it even started.  *See id.* at 4-5.  Defendant also notes that, in context, it was obvious that the agents believed that she made trips to Del Valle's office to pick up money on Defendant's behalf, whether they explicitly said so or not.  *See id.* at 5.  Finally, Defendant argues that these statements are not admissible as co-conspirator statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence because the Government cannot show that CC-1 joined the conspiracy with the requisite knowledge to make her a co-conspirator, that her statements were made during and in furtherance of the conspiracy, and that Defendant's confrontation rights would not be infringed by admitting her statements to law enforcement.  *See id.*  "It is not enough that [CC-1] may have known that *some* crime was committed, without the specific intent to advance the objects of the conspiracy." *Id.* (citing *United States v. Hassan*, 578 F.3d 108, 123 (2d Cir. 2008); *United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004); *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001)).

Here, the Court finds that CC-1's false exculpatory statements are not hearsay because they are not being offered for their truth.  Rather, they are being offered to prove CC-1's consciousness of guilt regarding her involvement in the referral scheme.  CC-1's repeated and allegedly false denials of otherwise innocuous behavior – regular phone contact with one of Del Valle's employees and multiple visits to his office – reveals her knowledge that her conduct was not, in fact, innocent.  Additionally, her unprompted insistence that she "don't need to go look for money or anything at Del Valle's," without any mention of money by the agents up to that point, is evidence both that CC-1 connected visits to Del Valle's office with "look[ing] for money," and that she wished to conceal that connection from law enforcement – so much so that she was willing to make false statement to agents after being warned that doing so was a crime.

As to the statements' admissibility as co-conspirator statements, the Court is not convinced that they satisfy the requirements of Rule 801(d)(2)(E).  As noted above, a statement is admissible under Rule 801(d)(2)(E) if the Government proves by a preponderance of the evidence that "(1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy." *United States v. Cruz–Rea*, 626 F.3d 929, 937 (7th Cir. 2010); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 959 (2d Cir. 1990).  Statements made in furtherance of a conspiracy may include "comments designed to assist in recruiting potential members, to inform other members about the progress of the conspiracy, to control damage to or detection of the conspiracy, to hide the criminal objectives of the conspiracy, or to instill confidence and prevent the desertion of other members." *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000).  A statement may be admissible under Rule 801(d)(2)(E) even if it is not "'exclusively, or even primarily, made to

further the conspiracy.'" *Cruz–Rea*, 626 F.3d at 937 (quoting *United States v. Singleton*, 125 F.3d 1097, 1107 (7th Cir. 1997)).

The dispositive question is whether the statements were intended to further the conspiracy, something that can easily be the case when a conspirator speaks to an undercover government agent, but is less common when speaking to known authorities.  As the Supreme Court explained, "confession or admission by one coconspirator after he has been apprehended is not in any sense a furtherance of the criminal enterprise.  It is rather a frustration of it." *Fiswick v. United States*, 329 U.S. 211, 217 (1946).  Consequently, "conspirator statements to a known police agent are admissible under Rule 801(d)(2)(E) only if intended to allow the conspiracy to continue, for example, by misleading law enforcers." *United States v. Alonzo*, 991 F.2d 1422, 1426 (8th Cir. 1993).  As this last quote suggests, even a statement to someone the declarant knows to be a police officer can be in furtherance of the conspiracy if the statement is intended to conceal the ongoing conspiracy.  *United States v. Heron*, 721 F.3d 896, 903 (7th Cir. 2013) (statement to police officer during traffic stop).  "[T]he statements must be such as to prompt the listener – who need not be a coconspirator – to respond in a way that promotes or facilitates the carrying out of a criminal activity." *Maldonado-Rivera*, 922 F.2d at 958.

Here, the Court does not doubt that the Government will be able to establish by a preponderance of the evidence that a conspiracy existed and that Defendant and CC-1 were members of the conspiracy.  However, the Court fails to see how these statements were made both during and in furtherance of the conspiracy.  Generally, a denial of wrongdoing made to law enforcement agents would not be considered "in furtherance" of the conspiracy.  *See United States v. Vargas*, 279 Fed. Appx. 56, 61 (2d Cir. 2012) ("Because the statements of the witnesses were made to law enforcement agents, they were not 'in furtherance of the conspiracy'").  Given

these concerns, and the fact that the Government did not provide additional argument on this issue in its response to the pending motions, the Court will reserve judgment on the admissibility of this evidence.[4]

The Court also has concerns that the admission of some (or all) of these statements would violate Defendant's Confrontation Clause rights. In *Crawford v. Washington*, 541 U.S. 36, 57-59 (2004), the Supreme Court held that the Confrontation Clause of the Sixth Amendment prohibits the admission of out-of-court "testimonial" statements against a criminal defendant at trial unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. In *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court further clarified that the scope of the Confrontation Clause is confined to "testimonial" statements. *See id.*; *see also Bierenbaum v. Graham*, 607 F.3d 36, 49 (2d Cir. 2010). Thus, as the Second Circuit explains, "the inquiry under the Confrontation Clause is whether the statement at issue is testimonial. If so, the Confrontation Clause requirements of unavailability and prior cross-examination apply. If not, the Confrontation Clause poses no bar to the statement's admission." *United States v. Feliz*, 467 F.3d 227, 232 (2d Cir. 2006).

Although the *Crawford* Court "declined to 'spell out a comprehensive definition of "testimonial,"' it provided examples of those statements at the core of the definition, including prior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations." *United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004) (quoting *Crawford*, 541 U.S. at 50-52, 68). The "critical factor," the Second Circuit explained in interpreting *Crawford*, "is 'the declarant's awareness or expectation that his or her

---

[4] The Court is also concerned about the prejudice to Defendant concerning CC-1's statement "I don't need to go look for money or anything at Del Valle's. Look for money for what?"

statements may later be used at a trial.'" *United States v. Farhane*, 634 F.3d 127, 163 (2d Cir. 2011) (quoting *Sagat*, 377 F.3d at 228).

Thus, for example, the *Crawford* Court itself acknowledged that "[m]ost of the hearsay exceptions cover[ ] statements that by their nature [are] not testimonial — for example, ... statements in furtherance of a conspiracy." *Crawford*, 541 U.S. at 56; *see also United States v. Logan*, 419 F.3d 172, 178 (2d Cir. 2005) ("In general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial").  According to the Second Circuit, moreover, "a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*." *Saget*, 377 F.3d at 229; *see also United States v. Farhane*, 634 F.3d 127, 162-63 (2d Cir. 2011) (same).

Here, the statements made by CC-1 were made during an interrogation by special agents during the course of executing search warrants.  As such, they appear to fall within the category of testimonial statements that would be precluded by *Crawford* and its progeny if offered for the truth of the matter asserted.  *See United States v. Paulino*, 445 F.3d 211, 216-17 (2d Cir. 2006) (holding that "[i]t has long been the rule that '[s]o long as ... statements are not presented for the truth of the matter asserted, but only to establish a context ..., the defendant's Sixth Amendment rights are not transgressed'") (quotation omitted).

Given these concerns and the fact that the Government has not had an opportunity to fully address these matters, the Court will reserve judgment on the admissibility of CC-1's statements. The parties should be prepared to address this issue prior to jury selection.

**E.      Non-Criminal Enforcement and Other Irrelevant Topics**

In its motion, the Government argues that Defendant should be precluded from arguing "that his conduct should be dealt with through some civil employment or administrative process,

rather than through this criminal prosecution." Dkt. No. 65 at 18.  Additionally, the Government contends that Defendant should not be permitted to introduce evidence or arguments regarding potential punishment, prior good acts, lack of prior bad acts, uncharged defendant, and other irrelevant topics.  *See id.* at 20-22.  In response, Defendant asserts that he will not be arguing that the jury should acquit him "because this is a simple employment dispute that should be handled internally within the Court itself." Dkt. No. 66 at 11.  Similarly, Defendant indicates that he does not intend to delve into the other topics raised by the Government.  *See id.* at 12.

In light of Defendant's response, the Court denies this aspect of the Government's motion *in limine*.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, the Court hereby

**ORDERS** that the parties' motions *in limine* are **GRANTED in part, DENIED in part, and RESERVED ON in part**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 29, 2023
          Albany, New York

Mae A. D'Agostino
U.S. District Judge