**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

     v.

                              Honorable Mae A. D'Agostino
                              Case No.: 7:23-CR-00161 (MAD)

DIONISIO FIGUEROA
             Defendant.

---

## SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE

---

### I.      INTRODUCTION

Dionisio Figueroa is a kind-hearted man with a bigger than life personality who makes positive contributions in every setting he is in and at every stage of his life. Throughout his 67 years, Dionisio has been a dedicated son, father, friend, community member,  and perhaps of equal importance to Dionisio, for over twenty of those years, a member of the court family in the Southern District of New York. Dionisio's kind words and actions have made impressions on all he encountered over the years. This includes everyone from the venders on the street outside the Manhattan apartment he has called home for over 25 years, to the co-workers, judges, and attorneys he interacted with on a daily basis at his other home, 500 Pearl Street in downtown Manhattan.

Twenty-six-year-old Dionisio Figueroa came to this country in 1983. When he arrived in New York over 40 years ago, he had a High School education, he barely spoke English, had no money, no job, and his family was back in the Dominican Republic.  By 1988 Dionisio had earned his United States citizenship and gained employment.  During the 80's he worked at several different jobs. He held positions in a clothing factory, a frame factory and as a valet.  Dionisio always knew he was destined for a better career.  In the early 1990's he completed coursework in New York State civil service.  After completing the work, he took and passed the civil service exam on the first try.

From 1995 through 2002 Dionisio was a Keyboard Specialist 1 at the New York Division of Housing and Community Renewal in the Bronx, New York. At the urging of his co-workers and supervisors, he answered a posting for Magistrate's Clerks office. He has been employed in the clerk's office in the Southern District of New York, from 2002 through the date of his arrest and ultimate termination in 2023.

Dionisio's conviction has marked the end of his career, the end of relationships with coworkers that he dearly treasured, public humiliation and shaming, a public trial and the possibility of a jail term at 67 years old. A term of incarceration will have lasting, irreversible impact on his home, family, friends, and the community he has been a part of for over 25 years. Dionisio feels deep remorse for letting down the people he built such wonderful relationships with over the years. He has been truly humbled to hear the positive impact he has had on the

lives of the people he has met over the years, whether it be a Magistrate Judge, the Southern District Federal Defenders, or CJA counsel attorneys and their clients. He will struggle with his conduct and his convictions for the rest of his life.

These factors, among others, make the guideline range of 41-51 months and the PSR's recommendation of a sentence of 32 months excessive. The defense is seeking a non-incarceration sentence that includes community service and supervision. Such a sentence is justified and warranted by the facts and circumstances of the case and Dionisio's history and characteristics.

As to the circumstances of the case. First, there was no "loss" amount calculated by the government or suffered by the court system in the SDNY. There is no restitution to be made. The use of "gain", as authorized by the controlling guideline for bribery cases (U.S.S.G. Chapter 2C1.1), regardless of if the court determines that gain to be correctly calculated under the terms of the PSR or some lower amount based on the defense arguments on "gain", results in a range greater than necessary to address the purposes of punishment. The "gain", even as alleged by the government, when spread out over the years of the alleged crime, in conjunction with the number of referrals and even fewer established payments over those years shows, Mr. Figuroa's conduct was the exception to an otherwise stellar career. This was not his modus operandi; rather in certain circumstances when a client expressed concern, culturally or otherwise, was a referral made and even fewer times was any payment made to Figueroa. Mr. Figuero's modest lifestyle and unchanged financial status supports the lack of significant gain resulting from his

referrals. The letters submitted by the CJA counsel attorneys and by those appearing most in the Magistrate Court, establish Mr. Figueroa as a tremendous asset to their interests, those of their clients, and to the court system. Likewise, Mr. Figueroa's work evaluations, created by his supervisors are exemplary and truly show the character of the man that stands for sentencing.

Second, the nature of Mr. Figueroa's statements falsely denying his involvement in referring cases to an attorney are not so significant as to warrant a two-level enhancement under U.S.S.G. § 3C1.1. The five months between the statements and the indictment in this case had little or nothing to do with the statements themselves. Mr. Figueroa was in an obvious emotional state. Even so, Mr. Figueroa admitted to a number of referrals in the interview. As is clear in the recordings and the trial testimony, the government placed no reliance on Figueroa's statement. In this case, Mr. Figueroa's conviction for the false statements is sufficient to address the statements. Any added enhancement is not justified. As probation points out, even without the obstruction enhancement, the false statement count would not add to Mr. Figueroa's overall guideline.

Third, the loss Mr. Figuroa has already suffered and the punishment he has endured is a tremendous personal deterrent. The public nature of his fall from grace serves as a significant general deterrent to those similarly situated to Mr. Figueroa or his co-defendant.

Dionisio is a true example of the American dream. He is 67 years old. He worked his way up from nothing, barely speaking English to a coveted position with

the courts. He is an incredible family man. Cares deeply for his community and contributes what he can to his friends in need. He lost his career, his work family, his good name, reputation, and his income. He is not a danger to the community and his conviction, and that of his codefendant, has sent a powerful message to the legal community in the Southern District of New York and beyond.  Dionisio has no prior criminal record and has never been punished with jail or otherwise.

Probation itself has recognized that a variance below the guidelines range is appropriate noting Figuroa's age (67), as well as the lack of any prior incarceration and the principle of incremental punishment. Probation's concerns for the need for additional general deterrence fails to appropriately consider the public nature of this offense and the loss of career, friends, and reputation that has spread across the legal community in the SDNY and beyond. Further, letters from those in the court community contradict the damage probation and the government attribute to Mr. Figueroa's conduct. Rather, when weighing all of Mr. Figueroa's positive contributions against the conduct in this case, many letters from those in the system call for a non-incarceration sentence.

The defense's requested sentence of a non-incarceration with community service and two years of supervision satisfies the purposes of sentencing pursuant to Section 3553. Restitution is not an issue, and as probation recognizes, Mr. Figueroa does not have the ability to pay a fine (PSR ¶87). The defense is seeking a sentence of no incarceration, community service, two years of supervision, no fine and a 300.00 special assessment.

## II.    DIONISIO'S PERSONAL HISTORY AND CHARACTERISTICS

   *a.  Dionisio's Life Outside the Southern District of New York*
       *Magistrate Clerk's Office.*

Dionisio grew up in the Dominican Republic. He recalls a loving household in which his mother was protector and his father was the bread winner. He recounts stories of how the neighborhood in which they grew up was dangerous, but he never realized it because of all the efforts his mother took to protect and shelter him.

Dionisio left the Dominican Republic in 1983. He came to the United States in pursuit of the American Dream. He barely spoke English. He had no financial resources. What he did have was a tremendous work ethic and the drive to better his life and the lives of his parents and siblings. He arrived in the Bronx at the age of 26. He has lived there all his life. Dionisio has been in the same modest, rent-controlled apartment for over 25 years. (Exhibit 1, video of Apartment November, 2022).

During his time in the United States, Dionisio has seen his mother and his father both pass away. Dionisio referred to his mother, Marina Peguero,  as the "love of his life". PSR ¶60 He suffered greatly when his mother passed in December of 2000. A picture of a younger Dionisio and his mother is attached in Exhibit 2A. Dionisio's father, Catalino Figueroa, remained in the Dominican Republic until he became ill with a lung infection. Dionisio brought his father to the United States for treatment. He spent days with his father while he battled his lung disease, slowly dying. His father passed in June, 2018 at 93 years old. Dionisio was a proud son. A

6

few pictures he took with his father toward the end of his life are attached as Exhibit 2B-D. He kept these pictures, and those of his mother with him as constant reminders of them. He took his father's body back to the Dominican Republic and buried him next to Marina. Exhibit 2E. All his friends provided him financial support to get his father back with his mother in the Dominican Republic.

Dionisio is close to his only son Dayonis. He is now 40 years old. Dionisio brought him to the United States when he was 16 years old. He has always had a close relationship with his son. Throughout the years Dionisio has help his son with whatever he needed. He helped him buy a car that he used for his work as a livery driver. Dayonis has one son, age 18, Dionisio's only grandson. Dionisio is proud of his grandson, as can be seen in Dionisio's face when he met and got to get his grandson and his father together. Exhibit 2F-G.

Dionisio's friend network is community based. He spends his non-working hours with his longtime friend Martha and friends in the community. Many have been friends for over 20 years. Community service plays a big part of Dionisio's life. Since he was a child in the Dominican Republic, he found comfort in sports. He was a star baseball and basketball player when young. He still plays basketball for charity. Exhbit 2F He was proud to be a member of Leyendas Varias Luces, a group that helps local community children and those n thei Dominican Republic. Dionisio kept some pictures of the events with him on his phone. Exhibit 2G-H. He is proud of his involvement.

   b.  *Dionisio's Life as a Docket Clerk in the Southern District of New*
       *York*

Dionisio's career path in the United States has been an upward trajectory. A

career that culminated in May of 2002 with the position of docket clerk for the

Clerk's Office in the SDNY. (PSR ¶¶ 76-80 ).  Testimony during the trial revealed

the type of reputation Dionisio built over his years in the Clerk's Office.

   Daniel Ortiz, Director of Criminal Case Operations, observed,

   "He was a great representative of the court. He was super helpful to all the
   folks that came to the window. We had family members, a lot of times you'd have
   family members coming to the window and a family member is under arrest and it's
   their first time in the courthouse, so they don't really know what to do and what to
   expect, and he was always the friendly face and he was there to assist whoever
   came to the window."-- Transcript, P. 735 LL., 2-8

He treated everyone from the public to U.S. Attorneys to CJA Counsel, Private

Attorneys and Federal Defenders the same. "He was terrific", "always friendly,

courteous, helpful".  *Id.* at 736.

   Tracy Miller, Assistant Director of Criminal Case Operations, at the time of

her testimony would describe Dionisio as someone who cared deeply about his job,

showed empathy to those that came to the magistrate clerk's office, was helpful to

lawyers that came to the clerk's office, to prosecutors that came to the clerk's office

and was amicable with all his co-workers. *Id.* at PP. 134, 135.

   Attached to this memorandum as Exhibit 3 are Dionisio's workplace

employee performance evaluations and nominations for outstanding achievement.

Many of these same evaluations were introduced during the defense case. Many

8

were produced by Ms. Miller and Mr. Ortiz. All have glowing things to say about Dionisio's job performance over the years. Exhibit 3.

Mr. Ortiz and Ms. Miller are not alone in their stated opinions of Mr. Figueroa. Attached to this memorandum are the letters from many of those in the SDNY that crossed paths with Mr. Figueroa over the years. At the time of the filing of this memorandum, many members of the SDNY legal community took the time to write to the court on Mr. Figuroa's behalf. They include the following:

- Debra Freeman, Esq. – retired Magistrate Judge SDNY of 20 years.
- Jennifer L. Brown, Esq. – Attorney in Charge SDNY FPD.
- Deirdre D. von Dornum, Esq. AFPD over 20 years.
- Zachary Margulis-Ohnuma, Esq.  – Former clerk and current CJA in SDNY and EDNY.
- Megan Benett, Esq. – SDNY CJA 2011-present.
- Lisa Scolari, Esq. – SDNY CJA for more than 30 years.
- Sarah Kunstler, Esq. – SDNY Criminal Defense Lawyer almost 20 years.
- Neil B. Checkman, Esq. – CJA SDNY and EDNY for over 30 years. Recently retired.
- Avrom Robin, Esq.  – Almost 20 years as CJA for SDNY. Recently retired.
- John M. Burke, Esq. – CJA SDNY for over 20 years.
- Kelley Sharkey, Esq.  – CJA SDNY for over 20 years.
- Michael H. Sporn, Esq. – 40 years CJA SDNY
- Louis M. Freeman, Esq. – 50 years Criminal Defense, CJA SDNY, EDNY 40 years.

Members of the SDNY legal community have echoed the same thoughts about Dionisio and the purposes of sentencing.

> *"It would be difficult to overstate Dionisio's kindness and willingness to help the people he encountered while working in the clerk's office."*
> *Lisa Scolari Esq.*

> *"[T]he kindness that Dionisio showed me has shaped my practice immeasurably. In many cases, there is very little I can do to change*

*the practical outcome of my client's cases; but what I can ALWAYS do is treat them with the kindness I learned from Dionisio." Sarah Kunstler, Esq.*

*"He was just generally helpful and kind in ways that mattered. He did whatever he could to ensure that clients and their families were treated humanely by the Court during a very difficult time." Jennifer L. Brown, Esq.*

*"I can't tell you how many people both in and out of the office commented on how sad it was to see the mug shot of Dionisio that has been hanging just outside the main entrance of the US Attorney's office at One St. Andrew's for over a year. He has been publicly shamed for his conduct. He has lost a job that he was very good at and that he loved. In these ways, this very proud man has already been punished." Jennifer L. Brown, Esq.*

*"I urge this Court to sentence him with the compassion he has shown so many of our clients." Neil B. Checkman, Esq.*

*"Dionisio took the time to explain to all of them, slowly, carefully, in detail, and in Spanish, how the criminal justice process, especially bail with conditions, worked. Dionisio went to great lengths to calm the family members and make them as comfortable as he could with the process. He didn't have to do any of this. He did it because he truly felt the families' anxieties and fears." Avrom Robin, Esq.*

*"Indeed, "good-hearted" was the first thing that came to mind when I thought about how best to describe Mr. Figueroa in this letter." Hon. Debra Freeman, Esq.*

*"He also is a good man. Beyond making sure that all the moving parts get to the finish line, I have seen him go out of his way to help relieve anxious family members by making sure they connect with appointed lawyers in what can be a hectic, inscrutable scene to those unfamiliar with the process. I have no doubt he acted out of human compassion." Michael H. Sporn, Esq.*

*"I don't lament any cases I might have lost to Dionisio's criminal scheme because I do not believe that any defendants were in fact hurt by his actions, wrong as they were. I hope that my status as a victim and as an advocate for people denied effective assistance of counsel will give my opinion and voice a bit of extra weight as I suggest to the*

10

*Court that, in my view, there is no need for incarceration (or even home confinement) for Dionisio." Zachary Margulis-Ohnuma, Esq.*

*"I watched (and listened to – I am fluent in Spanish) Dionisio speak to hundreds of defendants released on bail and carefully explain their bail conditions to them, making certain he was doing all he could so they understood. I listened to him reassure anxious families. I watched him help defense counsel and young AUSAs alike navigate the arraignments process. He was full of heart."*

*"Of one thing I am sure: Dionisio never did anything that would hurt a defendant. If he recommended a lawyer to a defendant or that defendant's family, he did so out of a belief that the lawyer would do a good job for the defendant." Deirdre D. von Dornum, Esq.*

*"As you know, he was a clerk in the magistrate's section. But he wasn't just a clerk; he was the "face" of the section. He welcomed everyone the same way, with a big smile. He was always helpful. He translated the language of the bond from English into Spanish. He went out of his way to explain the bond terms carefully and patiently and was always willing to answer questions or retranslate." Louis M. Freeman, Esq.*

The letters supply many more thoughts and stories about Dionisio and his character. In all, the conclusion drawn by all is a jail sentence is not necessary to meet the purposes of punishment when the totality of the circumstances is weighed.

## III.   THE NATURE AND CIRCUMSTANCES OF THE CASE

At every step of the way – from the initial rumblings of a complaint up through sentencing - there has been a stark divide between on the one hand, the Government's worst fears and suspicions about this case and the conduct it involved, and on the other hand, the reality of an unfortunate situation as proven at trial and elsewhere.  Persistent badmouthing of appointed counsel to induce defendants to retain Mr. Del Valle became one relatively innocuous statement over

the course of a 20-year career.  Breaking into code to conceal his statements became speaking Spanish with those who were more comfortable in their native language. Seeking out opportunity revealed itself to be more the product of Mr. Figueroa's inclination to be helpful and in the center of the action.  Tens of thousands of dollars in bribe money withered down to some amorphous, ambiguous figure that Ms. Silva was plainly uncomfortable even trying to ascertain.  Even the false statement was hardly an elaborate lie designed to throw investigators off the scent so much as a reflexive denial of criminal wrongdoing borne of some combination of anger, fear, pride and indignation.

Nor was it inevitable that Mr. Figueroa would be charged, or that the investigation would result in a criminal prosecution, as opposed to some civil or workplace sanction.  There was no constituency or aggrieved victims clamoring for heads or justice.  Those that were, like Roberto Torres, appeared to have their own corrupt agenda.   And those most directly and proximately harmed, the CJA counsel who lost clients to Mr. Del Valle, appear to be of the view that Mr. Figueroa is amply deserving of leniency and should be spared a custodial sentence. Nevertheless, we do not argue that, on some level, the Courts itself, and the administration of justice, were not harmed in some capacity.  But that harm was not as pervasive or insidious as in the worst possible version of events.

It is not the wholesale perversion of justice the government portrayed it to be, or the gross dereliction of duty by a corrupt, double-dealing employee.  We accept the jury's verdict that neither was it the innocent relationship the defense portrayed

at trial.  We are now at sentencing, after all.   At some point, an ill-defined, loose arrangement or understanding morphed into something beyond the boundaries of what the law permits.  But that "something" was not the corrupt, solely transactional relationship envisioned by the Government.

## IV.    THE CORRECT GUIDELINES

### a. *The evidence does not establish to a preponderance of the evidence a gain of between $40,000 and $95,000.*

The Government bears the burden of proving both the existence and the amount of the loss enhancement. *See United States v. Williams*, 247 F.3d 353, 358 (2d Cir. 2001). The Guidelines permit a "reasonable estimate" but in determining the amount, courts may not engage in "pure speculation." *United States v. Deutsch*, 978 F.2d 878, 886 (2d Cir. 1993). Concluding that the amount of monies paid to Mr. Figueroa was more than $40,000 is an exercise in guesswork or conjecture, fueled more by the Government's aspiration than what the evidence actually showed at trial. The standards for establishing loss or gain under Chapter 2B1.1 do not permit the type of averaging or unproven extrapolation needed to reach $40,000, particularly where the Government did not show that Mr. Figueroa was paid for every referral that resulted in retaining Mr. Del Valle, and where Ms. Silva was uncomfortable testifying as to the number of instances in which envelopes were picked up, and what amounts were included therein (or gave an especially wide range). In short, simply because "precision" is unnecessary, *see United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009), it does not follow that over $40,000 was established by a preponderance or otherwise.

At most, the amount of gain supported by the trial record is between $6500.00 and $15,000.00. Therefore, the six-level guideline enhancement as called for by the PSR ¶ 42 should be rejected. Although the defense has argued that the application of the "loss" guideline to the facts of this case would result in an unjust sentence, if any adjustment is applied it is a two-level adjustment pursuant to U.S.S.G. § 2B1.1(b)(1)(B).

b. *The Obstruction enhancement should not apply.*

The record fails to establish that the statements significantly obstructed or impeded the official investigation or prosecution of the offense. Testimony adduced at trial from the agents does not establish significant obstruction or impeding of the investigation based on Mr. Figueroa's unsworn statements. *See United States v. Borker*, 2019 U.S. Dist. LEXIS 69829, at *56 (S.D.N.Y. Apr. 24, 2019) (declining to apply enhancement for defendant's false, unsworn post-arrest statements to agents absent a showing that they significantly impeded official investigation or prosecution); *see also United States v. Khimchiachvili*, 372 F.3d 75, 80-81 (2d Cir. 2004) (discussing obstruction enhancement generally and USSG's "common sense definition of what constitutes obstruction of justice – conduct that willfully interferes with or attempts to interfere with the disposition of criminal charges against a defendant" but also limiting principles). While in these cases the statements were made post arrest, a temporal component doesn't seem relevant: all that matters is whether there was proven intent to impede an *ongoing* investigation. *See United States v. Young*, 811 F. 3d 592 (2d Cir. 2016); *United*

14

*States v. Brown*, 321 F.3d 347, 351 (2d Cir.2003). (Court must find that the defendant consciously acted with the purpose of obstructing justice).

It is not sufficient merely to find that the defendant made materially false statements concerning his offense conduct. *United States v. Bradbury*, 189 F.3d 200, 205 (2d Cir.1999). Here, the record does not establish Mr. Figueroa consciously acted with the purpose of obstructing justice. First, he admitted some incriminating conduct, making referrals. Second, as heard during the trial, the statements were a reflexive denial of criminal wrongdoing borne of some combination of anger, fear, pride, and indignation. The two-level enhancement scored in the PSR ¶ 45 should be rejected under the facts of this case.

### c. *Additional Challenges to the Guideline Calculation.*

In addition to the specific objections noted above, the guideline calculation here expressly includes facts that are inherent in the commission of this offense.  It does so in a way that does not amount to double counting, but nevertheless addresses aspects of the conduct or factors that are not incrementally any worse or more culpable than the offense itself.  Or in Judge Newman's framing, he criticizes the premise of "incremental immorality" such that "for every discrete aspect of criminal conduct, there must be a discrete measure of extra punishment," which merely "creates an illusion of precision . . . [and] makes no penological sense."  *See* Testimony of Jon Newman Before the United States Sentencing Commission, July 9, 2009, at 4-8, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20090709-10/Newman_testimony.pdf.  This

mocks the idea of individualized sentencing that the Supreme Court and Second Circuit require, *see United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010), and also the uncontroversial notion that "sentencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime." *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2012).

That the offense conduct involved more than one bribe is, for all intents and purposes, a necessary feature here.  If the conduct was limited to one exchange between Mr. Del Valle and Mr. Figueroa, they almost certainly would not have been charged, let alone in a decade-long conspiracy.  So *this* offense necessarily required more than one payment, and it is not any worse or more egregious because of that reality, particularly when it likely began without criminal intent.  Further, if the Guideline range is increased by the cumulative value of the money exchanged, it necessarily will account for the fact that more than one payment was made, the value of which would have otherwise been limited to $2000 or less, and under the threshold for a "loss" or "gain" adjustment under Chapter. 2B1.1.  That we are increasing sentencing exposure because of the cumulative amount of money across a number of occasions, *and* because those occasions numbered more than one is, at best, redundant.

Likewise, that Mr. Figueroa is a public official under Chapter 2C21.1 is a necessary part of the offense and the role he played.   He plainly would not have been in the position of referring clients to Mr. Del Valle in the Magistrate Clerk's

office if he did not work there in some capacity.  There would have been no offense, so it seems odd that a necessary ingredient should be considered something of an aggravator.  "Public official" would cover a great range of offices, from the President on down to a clerk, a functionary who had no decision-making authority or ability to influence the course of criminal cases[1].  And it may make sense to hold some office-holders to a higher standard than ordinary citizens.  It serves to distinguish him from Mr. Del Valle (who presumably did not have the public official enhancement applied to his Guideline range) even though many viewing the facts and equities here would view Del Valle as more culpable than Mr. Figueroa.

Similarly, the enhancement for obstructing justice under Chapter 3C1.1 is duplicative of the conviction for the Section 1001 count itself.  It adds nothing to the mix that the False Statement count does not cover, even in light of the Grouping rules and the interplay with multiple counts of conviction.  If it is fair game for the Government to point out, as it does, that Mr. Figueroa was found guilty of lying to federal investigators, the Guideline enhancement is another story.

In short, the Guideline enhancements, unless scrutinized with great care, do not together yield a reasonable sentence.  They address mostly cumulative aspects of the offense itself, without any great increase in wrongfulness.  It makes little sense, beyond being more punitive, to simply punish Mr. Figueroa for the same

---

[1] It is worth reminding that whereas Mr. Figueroa's position afforded him access to sealed, confidential and very sensitive information that presumably would have been of great value to the targets of the Government's investigation, the actual offense conduct did not involve trading on that information, and is far more anodyne.

thing over and over and over again.  The base offense level in Chapter 2C1.1, 12, accounts by itself for virtually all the facts and circumstances justifying the enhancements.  That would yield an advisory range of 10-16 months.  Still greater than necessary in light of Mr. Figueroa's history and characteristics, it would be a far more reasonable starting point.

## V.    REGARDLESS OF THE  FINAL ACCEPTED GUIDELINE LEVEL A SENTENCE BELOW THE GUIDELINES IS WARRANTED BY THE 18 U.S.C. 3553 (a) (2) FACTORS.

In determining the appropriate sentence, the law directs the Judge to "impose a sufficient, but not greater than necessary sentence, to comply with the purposes " of sentencing. Of the four purposes listed in 18 U.S.C. §3553(a)(2), none require a jail sentence.

The advisory Guideline sentence, even if the Court sustains Mr. Figueroa's objections, seems to embrace a more heartland version of what bribery necessarily entails.  Dionisio's, a low-level functionary, ability to influence events was limited at most to which lawyer represented which defendant (and only if that defendant eventually retained Mr. Del Valle, a capable, experienced, and respected attorney), not the ultimate outcome of the case or some preferential treatment for some criminal defendant over others.  With their relentless focus on loss (here, gain, as it were, in a way that has a different impact and harm than loss to an individual or institutional victim) and other dubious, overlapping enhancements that apply more in form than in substance, the Guidelines have strayed from their original mandate in 28 U.S.C. § 994(j) to insure that that they "reflect the general appropriateness of

18

imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense[.]"

Surely a bribery scheme can cover a broad range of conduct along a spectrum or continuum of culpability.  Surely some offenders along that spectrum commit extraordinarily serious crimes.  Others less so.  We leave to the Court where to place Dionisio Figueroa on this spectrum, but respectfully submit that his actions as the jury necessarily found them are not among the most serious the Court will see or has seen, and do not require incarceration as a necessary corrective.  And they do not begin to speak to the measure of the man.

a.    *Specific and General Deterrence.*

The PSR recognizes a below guideline sentence is appropriate.  Figueroa's age (67), as well as the lack of any prior incarceration, and the principle of incremental punishment support such a sentence. According to probation, general deterrence is not an issue in this case. Dionisio has been terminated from his position. His conduct of referrals was not otherwise illegal. He will not be returning to work in the government with his felony convictions and at his age.

As to general deterrence to others similarly situated, a jail sentence is unnecessary in light of the public nature of this case and the public consequences already suffered by this defendant. Dionisio has lost his career, lost his friends, and was banned from the Federal Courthouse. His picture was posted as someone that

should be denied entry for over a year. Everyone in the Courthouse and the entire SDNY legal community was made aware of his fall from grace. The manner in which one of the most beloved employees in the district was prosecuted placed fear into all employees in his office and likely beyond. A jail sentence will not further the tremendous impact this case will have on generally deterring future crimes by others in the system.

        b.    <u>To Protect the Public from Further Crimes of the Defendant</u>.

Dionisio is not a criminal. His personal history and characteristics ensure the public he will not be committing any future crimes. Jailing Dionisio is not necessary to protect the public. His crime was entirely a crime of opportunity. He will never again hold a position with the Court.

        c.    <u>To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the Most Effective Manner</u>.

Again, based on Dionisio's age, lack of any substance abuse issues, lack of medical issues and lack of mental health issues he is not in need of any educational or vocational training, medical care, or other correctional treatment.

        d.    <u>*To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense*</u>.

Putting aside the government's reading of the events of the case, what was proven at trial was an ill-defined, loose arrangement or understanding that

morphed into something beyond the boundaries of what the law permits.  But that "something" was not the corrupt, venal, relationship envisioned by the Government. There can be no question that Mr. Figuroa's desire to help those that appeared before him at the window of the Magistrate Clerk's Office was initially the driving force behind his recommendation of Ted Del Valle, Esq.  His shared culture, language and ethnicity with Del Valle and many of those referred also played a part. The proof established that he ultimately accepted money from Del Valle. His conduct later in the course of events supports knowing it was wrong to take money.

However, his conduct had little effect on the cases in which lawyers were referred. He had no influence over the court or the course of the case. No clients claim any damage or that they felt any undue influence to hire Del Valle. Del Valle was a well-respected attorney. He had a long-standing history of representing those in the Spanish speaking community. Dionisio himself exercised no control over a case, had no decision-making authority and did nothing after suggesting Del Valle to unduly  push a client to retain the lawyer.

On the spectrum of bribery cases this one falls to the low end, more toward illegal gratuity or ironically, those defendants charged under Section 203 – the count the Court dismissed after trial.  For example, Samuel Pierre worked for a Brooklyn congressman and, along with a co-conspirator, was sentenced to three years' probation after he accepted unauthorized compensation for attempting to assist multiple constituents who had paid them over $10,000 to resolve immigration

issues then-pending before the Department of Homeland Security.  SDNY Case No.
13-cr-921-KNF.

Those convicted of a Section 203 offense are sentenced under U.S.S.G.
Chapter 2C1.3, which would have produced a range of 0-6 months, with a base
offense level of 6 and without the enhancements that apply under Chapter 2C1.1.
Whereas there is a fine line sometimes separating bribery cases under Section 201
from those prosecuted under Section 203, overall Mr. Figueroa's offense more
closely resembles the type of conduct charged under Section 203 for illegal
gratuities or the lesser-included offense under Section 201(c).

There are few actual bribery cases under Section 201 featuring comparable
conduct at the heart of the scheme to make a suitable comparison.  Most bribery
schemes feature more aggravated, serious misconduct that does not make such
defendants similarly situated, or would not create *unwarranted* sentencing
disparities.  Mr. Figueroa has little in common with the politicians and
powerbrokers who have found themselves in the crosshairs of the SDNY's public
corruption prosecutions in recent years.

It is the less spectacular, less newsworthy defendants rather than the
Assembly Speaker,  Senator, State Senator or Lieutenant Governor (or their
associates) who are more helpful reference points for sentencing purposes.  For
example, Kenny Liu, a 66-year-old naturalized citizen who served as a postal carrier
for 25 years, accepted illegal gratuities in the course of his mail route in Chinatown,
in Manhattan.  Over time, he took about $5200 dollars.  He was permitted to plead

to a misdemeanor count, and was sentenced to a $10,000 fine, with no custodial component to the sentence.  SDNY Case No. 19-cr-0039-JMF.

Another postal carrier, who worked for the post office for over two decades, agreed with others to re-route packages containing drugs in exchange for money. He pleaded guilty to a bribery scheme and conspiracy to commit honest services fraud, and received a time-served sentence, after having been released on conditions at the inception of the case.  SDNY Case No. 18-cr-778-RA.

Samuel Noel, a former paralegal in the U.S. Attorney's Office in the Eastern District of New York, was charged with exceeding authorized access after using a confidential Government database to look up the status of the Government's investigation into State Senator John Sampson, as well as five potential cooperating witnesses, as a favor to Sampson, a longtime friend, to whom he passed along the information[2].  He received a probationary sentence.  EDNY Case No. 12-cr-616-DLI.

While many if not all of these defendants pleaded guilty (at least one cooperated) and did not elect to proceed to trial, exercising his constitutional rights and putting the Government to its burden of proof should not come at the cost of such a drastic increase in sentencing exposure.  The Government surely would not look at these cases as appropriate comparators and could point to far more substantial sentences in more serious bribery prosecutions.  Respectfully, however,

---

[2] https://www.nytimes.com/2015/07/10/nyregion/on-stand-friend-of-john-sampson-recalls-losing-his-job-after-doing-him-a-favor.html

shining a spotlight as the Government did on this case will sometimes magnify the harm or the interests vindicated.  This is one such example where the glare of the trial, the public indictment and the press releases all portray a more systematically or pervasively corrupt arrangement than was actually the case, as discussed earlier. When stripped of exaggeration and excess, we believe the conduct in this case is closer to those discussed above.

The sentence requested by the defense is sufficient to  reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

## VI.    CONCLUSION

For all these reasons, Dionisio respectfully requests that the Court impose a non-jail sentence with community service,  two years of supervision and no fine. Such a sentence appropriately reflects the nature and circumstances of this case, Mr. Figueroa's history and characteristics and pays due deference to the sentencing guidelines.

March 19, 2024                          LISA PEEBLES
                                        Federal Public Defender

                            By:    /s/*Paul Evangelista*
                                   First Assistant Federal Public
                                   Defender
                                   54 State Street, Suite 310
                                   Albany, New York 12207
                                   (518) 436-1850 x. 4015
                                   Attorney for Dionisio Figueroa


                                   /s/*Jeremy Sporn*
                                   Assistant Federal Public Defender
                                   54 State Street, Suite 310
                                   Albany, New York 12207
                                   Attorney for Dionisio Figueroa